UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 06-359(DSD/SRN)

Allstate Property and Casualty
Insurance Company, an Illinois
corporation,

        Plaintiff,

v.                                                              **ORDER**

Teri Myllykangas, Melinda H.
Albers, Rebecca L. Albers, a
minor and Hannah M. Onderko,
a minor,

        Defendants.

v.

Farm Bureau Mutual Insurance
Company,

        Intervenor Defendant.


    Brian A. Wood, Esq., Paulette S. Sarp, Esq. and Lind, Jensen, Sullivan & Peterson, 150 South, Suite 1700, Minneapolis, MN 55402, counsel for plaintiff.

    Francis J. Eggert, Esq., Eggert Law Office, P.O. Box 789, Winsted, MN 55395, counsel for defendants.

    Todd M. Kleinhuizen, Esq. and Johnson, Moody, Schmidt & Kleinhuizen, 320 First Street S.W., P.O. Box 913, Willmar, MN 56201, counsel for intervenor defendant.


    This matter is before the court upon plaintiff's motion for summary judgment and intervenor defendant's cross-motion for summary judgment. Based upon a review of the file, record and

proceedings herein, and for the reasons stated, the court grants plaintiff's motion and denies intervenor defendant's cross-motion as untimely.

## BACKGROUND

This is an insurance coverage dispute under Minnesota law arising out of a motor vehicle accident that occurred on June 21, 2004. Plaintiff Allstate Property and Casualty Insurance Company ("Allstate") commenced this declaratory judgment action against defendants Teri Myllykangas ("Teri"), Melinda H. Albers ("Albers") and Albers's two minor daughters Rebecca Albers and Hannah Onderko. Teri is the daughter of Richard and Tamera Myllykangas (the "Myllykangases"). At the time of the accident, Teri was an unemancipated seventeen-year-old who lived with Steve and Shelly Bergquist (the "Bergquists"). Pursuant to Federal Rule of Civil Procedure 24, the court granted Farm Bureau Mutual Insurance Company's ("Farm Bureau") motion to intervene as a defendant in this action. Farm Bureau issued an insurance policy to Albers's husband that includes underinsured and uninsured motorist coverage and pursuant to which Albers and her daughters are insured.

Allstate issued an automobile insurance policy to the Myllykangases for the period of May 23, 2004, to November 23, 2004, (the "Policy"). (See Sarp Aff. Ex. 1.) The Myllykangases are the only named insureds on the Policy. The Policy provides insurance

coverage for two vehicles. According to the Policy's declarations both vehicles were driven only by an adult age 35 and not by any unmarried driver under age 25. (Id.) The Policy defines an "insured person," while using a non-owned automobile other than a rental vehicle, to include "any resident relative using a four-wheel private passenger auto or utility auto." (Id.) The Policy defines "resident" as follows:

> **Resident** or **reside** means the physical presence in your household with the intention to continue living there. Your unmarried dependent children while temporarily away from home will be considered resident(s), if they intend to continue to live in your household.

(Id. (emphasis in original to designate defined words).)

During the policy period, on June 21, 2004, Teri was driving a motor vehicle owned by the Bergquists when she collided with a vehicle being driven by Albers. Albers's minor daughters were passengers in the vehicle at the time of the collision. Albers and her daughters have asserted various claims against Teri as a result of the accident. Allstate commenced this declaratory judgment action to resolve whether it has an obligation to defend or indemnify Teri for any claims or judgments against her arising out of the June 21, 2004, accident. Whether Teri was a "resident" of the Myllykangases' household on the date of the accident and is insured under the Policy is the sole issue in this litigation.

In August 2003, ten months prior to the accident, Teri and her sister moved out of the Myllykangases' home following an argument

3

with their parents.  The Myllykangases gave Teri and her sister an ultimatum to abide by the parents' rules or move out, and the girls chose the latter.  A week later, the Myllykangases were informed that Teri and her sister had moved in with the family of Teri's sister's boyfriend, where they remained until approximately October or November 2003.  During that time, the boyfriend's parents financially supported Teri and facilitated registering Teri in a different school by obtaining the signatures of the Myllykangases. Teri worked at the painting business of the boyfriend's father. According to Teri, when she moved into the home of her sister's boyfriend she viewed the situation as permanent and had no intent to return to the Myllykangases' home or abide by the Myllykangases' rules.

In October or November 2003, Teri and her sister moved in with the Bergquists when Teri's sister broke up with her boyfriend.  The Bergquists were parents of a friend of the girls.  When Teri moved in with the Bergquists, she completed a change of address form at the United States Post Office so that she would receive all of her mail at the Bergquists' home.  According to Teri, she did not view living with the Bergquists as permanent, but she intended to live in the Bergquists' home until she and her sister could rent an apartment.  In early 2004, Teri wanted to get away from the environment at the Bergquists and stayed with her aunt for approximately four to six weeks.  Other than the brief period of

time she stayed with her aunt, Teri lived with the Bergquists until the date of the accident. The Bergquists financially supported Teri, and she considered them to be her guardians. The Bergquists gave Teri permission to use their vehicles, and she drove vehicles owned by the Bergquists several times a week.

After Teri and her sister moved out of the Myllykangas home, Teri never asked the Myllykangases if she could move back home, and the Myllykangases never asked Teri to return home. Teri never asked the Myllykangases for financial support or support of any kind, and the Myllykangases never offered to provide her or the families she stayed with any financial support. During that time, Teri called the Myllykangases only a few times to let them know that she was alive or to talk to her younger brother. Although Teri returned to the Myllykangas household on two occasions to visit her brother, the Myllykangases would not permit her to enter the home because she did not live there. Teri did not celebrate any holidays or family events with the Myllykangases, but celebrated Thanksgiving, Christmas and her seventeenth birthday with the Bergquists. At no time prior to the accident, while she lived with the Bergquists, did Teri intend to return to live with the Myllykangases.

Mrs. Myllykangas testified that although she initially had a little hope that her daughters would return home, it became clear to her as of October 2003 that they had permanently moved out. As

of the date of the accident, Mrs. Myllykangas had no plans that Teri would move back into the Myllykangas home. The Myllykangases were not concerned with Teri's financial support and refused to support her, reasoning that if Teri chose to move out she needed to find somebody to support her or get a job. During the 2003-2004 school year, the Myllykangases did not attend any school conferences or school activities relating to Teri. If school officials had any questions concerning Teri, Mrs. Myllykangas instructed them to contact the Bergquists. Mrs. Myllykangas packed up all of her daughters' remaining belongings and placed them in a storage room. Although she left the girls' beds in their former bedroom, her son started using one of the dressers and she gave the other dresser to a relative. Mrs. Myllykangas moved a computer into the girls' bedroom and began to use it as an office.

Shortly after Teri moved out, on October 17, 2003, Mrs. Myllykangas went to the Department of Public Safety and signed a written request to revoke Teri's driving privileges. (See Sarp Aff. Ex. 4.) Around that same time, she contacted her insurance agent to have Teri removed from the Myllykangases' insurance policy. She also contacted the local medical center to inquire about responsibility for medical expenses incurred by Teri, but was told that she could not avoid paying medical expenses for either daughter until they turned eighteen years old. Based on that information, Mrs. Myllykangas did not remove Teri from her

6

employer-sponsored health insurance coverage because she believed she could not avoid liability for medical expenses they incurred. According to Mrs. Myllykangas, after Teri moved out she had no way to know what Teri was doing and did not want to be financially responsible or liable for anything Teri did. The Myllykangases went so far as to consult an attorney to see whether they could have Teri emancipated. However, because Teri was already seventeen years old, the Myllykangases decided not to incur the expense involved to procure a legal emancipation. According to Mrs. Myllykangas, they would have proceeded with emancipation proceedings if Teri had been younger. As of the date of the accident, Mrs. Myllykangas believed that she and her husband had taken all steps necessary to avoid responsibility for any liability incurred by Teri after she moved out of their home.

Following the accident, Teri was treated at a hospital. The Myllykangases were not notified about the accident or informed by hospital staff that Teri had been in an accident or received medical treatment. The hospital staff notified the Bergquists and released Teri to Mrs. Bergquist. The Myllykangases found out about the accident one month after it occurred, when Teri mentioned to her mother over the telephone that she was no longer wearing a knee brace. In August 2004, Teri temporarily moved back into the Myllykangas home in anticipation of joining the military. Mrs. Myllykangas and Teri testified that the car accident had been a

7

"wake-up call." Although Teri agreed to follow her parents' rules and return to their household, she considered the return to be only a "rest stop or temporary place" until she joined the military. In October 2004, Teri went to Fort Jackson, South Carolina, to attend military training. Upon completion of her training, she returned to the Myllykangas home for a few weeks and then moved into her own apartment. Other than a period of time in detention, Teri continued to live in her own apartment until the time this lawsuit was filed.

Allstate now moves for summary judgment on the issue of coverage, arguing that Teri is not an insured under the Policy for the claims asserted against her by Albers and Albers's daughters because she was not a "resident" of the Myllykangas household on the date of the accident. Farm Bureau opposes the motion and noticed a cross-motion for summary judgment. Farm Bureau does not argue that there are any genuine issues of material fact but rather argues that the facts establish as a matter of law that Teri was a "resident" of the Myllykangas household.

## DISCUSSION

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

8

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. Id. at 252. On a motion for summary judgment, the court views all evidence and inferences in the light most favorable to the non-moving party. Id. at 255.

**II.   Insurance Coverage**

The court interprets an insurance policy in accordance with general principles of contract construction, giving effect to the intent of the parties. Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877, 880 (Minn. 2002). Unambiguous language is given its plain and ordinary meaning. Id. Ambiguous language is construed against the drafter and in favor of the insured. Nathe Bros. v. Am. Nat'l Fire Ins. Co., 615 N.W.2d 341, 344 (Minn. 2002). An insured has the burden to establish a prima facie case of coverage. SCSC Corp. v. Allied Mut. Ins. Co., 536 N.W.2d 305, 313 (Minn. 1995).

Neither party argues that the Policy's definition of "resident" is ambiguous or subject to a construction in favor of coverage. Rather, the parties dispute whether Teri was a resident of the Myllykangas home under the facts of this case. Under Minnesota law, the question of residency for insurance coverage

9

purposes is a question of fact resolved upon a review of the totality of the circumstances. See Fireman's Ins. Co. of Newark, N.J. v. Viktora, 318 N.W.2d 704, 708 (Minn. 1982); Schoer v. West Bend Mut. Ins. Co., 473 N.W.2d 73, 76 (Minn. Ct. App. 1991); Wood v. Mut. Servs. Cas. Ins. Co., 415 N.W.2d 748, 750 (Minn. Ct. App. 1987). An individual's residency is appropriately resolved on summary judgment when the record, policy language and deposition testimony establish no genuine issues of material fact. Am. Family Mut. Ins. Co. v. Thiem, 503 N.W.2d 789, 790 (Minn. 1993).

The court determines an individual's residence as of the date of the event that triggers a claim for coverage. State Farm Fire & Cas. Co. v. Short, 459 N.W.2d 111, 114 (Minn. 1990). In determining whether an individual is a resident of a household, the court considers numerous factors that include age, self-sufficiency, whether the individuals lived under the same roof, the nature and formality of the relationship, the intended duration of the relationship and living arrangements and future plans and intentions regarding the living arrangements. See Viktora, 318 N.W.2d at 707-08. In the context of a parent-child relationship, the court looks to all factors to determine whether the parent and child enjoyed an "intimate, informal family relationship indicative of a legal residence." Id. The court looks beyond an individual's relationship with the physical place and focuses on the individual's relationship with the "social unit that makes up the

insured's household." Lott v. State Farm Fire & Cas. Co., 541 N.W.2d 304, 307-08 (Minn. 1995).  The fact that an individual physically lives in the household of a named insured does not automatically render that individual a "resident" of the household for purposes of insurance coverage.  Id.

Farm Bureau argues that the fact that Teri was an unemancipated minor is dispositive of her residency for purposes of coverage under the Policy.  Farm Bureau contends that as a result of Teri's status as a minor, as a matter of law Teri's residence was the household of the Myllykangases, her legal custodians. However, Farm Bureau has identified no support for its proposition that an individual's status as a minor is dispositive of an individual's residence under Minnesota law.  To the contrary, in determining the residence of a child Minnesota courts consider age as one factor among others, such as purposefully staying away from the parents' home, living arrangements with other people, the degree of parental financial support and intent to leave indefinitely. See French v. State Farm Mut. Auto. Ins. Co., 372 N.W.2d 839, 841-43 (Minn. Ct. App. 1985) (collecting cases); see also Fruchtman v. State Farm Mut. Auto. Ins. Co., 142 N.W.2d 299, 301-02 (Minn. 1966); Krause v. Mut. Serv. Cas. Co., 399 N.W.2d 597, 601-02 (Minn. Ct. App. 1987); State Farm Fire & Cas. Co. v. Duel,

No. C7-98-208, 1998 WL 531821, *3 (Minn. Ct. App. Aug. 25, 1998) (troubled eighteen-year-old not resident relative of parents' household after parents asked her to move out).

Farm Bureau has provided the court no persuasive legal authority to support its contention that Teri's age or status as an unemancipated minor is controlling of her residence for purposes of insurance coverage.[1] To the contrary, the majority of state courts to consider the issue have held that a minor child is able to have a residence other than the household of a parent or legal custodian for purposes of insurance coverage. See, e.g., Farmers Ins. Co. of Az. v. Oliver, 741 P.2d 307, 312 (Ariz. 1987); Crawley v. State Farm Mut. Auto Ins. Co., 979 P.2d 74, 80 (Haw. Ct. App. 1999); Umland v. Nat'l Cas. Co., 81 P.3d 500, 503-04 (Mont. 2003); Farmers Ins. Co. of Or. v. Jeske, 971 P.2d 422, 426 (Or. Ct. App. 1998); Barricelli v. Am. Universal Ins. Co., 583 A.2d 1270, 1271-72 (R.I. 1990). Therefore, although Teri's age and her status as an unemancipated minor are relevant factors, the court considers those

---

[1] To support its contention, Farm Bureau relies on language from the Minnesota No-Fault Act that an insured for purposes of no-fault coverage includes "a minor in the custody of a named insured." Minn. Stat. § 65B.43 subd. 5. However, the No-Fault Act is not at issue in this case and, even if it was, under the No-Fault Act minors are insured only while "residing in the same household with the named insured." Id. Furthermore, the issue before the court is not one of legal custody, but of insurance coverage under the terms of the Policy. Therefore, Farm Bureau's reliance on the No-Fault Act is unpersuasive.

facts in conjunction with all the undisputed facts to determine whether Teri was a resident of the Myllykangas household.

In opposing Allstate's motion for summary judgment, Farm Bureau argues that the following facts establish Teri was a resident of the Myllykangas household as a matter of law: Teri's age, the Myllykangases claiming her as a dependent on their 2003 and 2004 income tax returns, Mrs. Myllykangas's decision not to remove Teri from her health insurance and Teri's inability to support herself. The court disagrees. The Myllykangases claiming Teri as a dependent for income tax purposes is not indicative of Teri's intent to reside in their household. Further, Teri lived with her parents for a brief period of time in 2003 and 2004, and for income tax purposes a dependent need only have lived with the claimants during the relevant tax year. As to the health insurance coverage, Mrs. Myllykangas testified that she would have removed Teri from the policy if she had not believed that she could not avoid liability for medical expenses incurred by Teri. Lastly, Teri's financial dependence on others does not weigh in favor of finding that she was a resident of the Myllykangas household. The Myllykangases deliberately refused to support Teri. To the extent Teri's inability to support herself is relevant, it weighs in favor of finding that she was a resident of the Bergquists' household because the Bergquists provided for Teri and financially supported her during the time period relevant to this litigation.

In evaluating Teri's relationship with the "social unit" that made up the Myllykangas household at the time of the accident, the court finds that the relationship between Teri and the Myllykangases was tenuous, if not severed, and cannot be considered close, intimate and informal. Not only did Teri not reside in the Myllykangas home, but she was forbidden from entering the home. Short of legal emancipation, which was considered and rejected for monetary reasons, the Myllykangases did everything they believed necessary to avoid liability for Teri. At the time of the accident, Teri had not resided in the Myllykangas home for nearly a year and lived with the Bergquists. As of the date of the accident, Mrs. Myllykangas and Teri consistently and unequivocally testified that they believed Teri's living situation away from the Myllykangas household was permanent and that Teri had no intent to return to that household.

Affording "resident" its plain and ordinary meaning, the court concludes that Teri was not a resident of the Myllykangas household on the date of the accident. The undisputed evidence of record establishes that she was not physically present in the home and did not have an intent to return or continue to live in the Myllykangases' household. Because Teri is not an insured under the Policy, Allstate has no duty to defend or indemnify Teri on any claims arising out of the motor vehicle accident on June 21, 2004. Therefore, summary judgment in favor of Allstate is warranted.

**III.  Farm Bureau's Cross-Motion for Summary Judgment**

On November 16, 2006, Farm Bureau filed a cross-motion for summary judgment, a notice of its motion and a single memorandum of law in opposition to Allstate's motion for summary judgment and in support of its cross-motion.  However, pursuant to the court's pretrial scheduling order dated May 9, 2006, all dispositive motions were required to be served and filed by November 1, 2006.  Further, pursuant to Local Rule 7.1(b)(1), no dispositive motion shall be heard by the court unless filed 45 days prior to the hearing.  The court heard oral argument on the pending motions on the date noticed by Allstate in its timely filed motion for summary judgment, December 8, 2006.  Because Farm Bureau did not file its cross-motion until November 16, Farm Bureau's motion for summary judgment was filed in violation of the pretrial scheduling order and the local rules.  Therefore, the court denies Farm Bureau's cross-motion as untimely.  If the court did not deny the motion as untimely, the court would deny the motion as moot based on the court's conclusion that summary judgment in favor of Allstate is warranted.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment [Doc. No. 17] is granted.

15

    2.   Defendant's cross-motion for summary judgment [Doc. No. 23] is denied.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  April 3, 2007

                                           s/David S. Doty  
                                           David S. Doty, Judge  
                                           United States District Court